E-filed: February 18, 2010

Gregory A. Brower (Nevada Bar No. 5232)
Patrick G. Byrne (Nevada Bar No. 7636)
Justin L. Carley (Nevada Bar No. 9994)
Claire Y. Dossier (Nevada Bar No. 10030)
SNELL & WILMER L.L.P.
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169
Telephone: (702) 784-5200
Facsimile: (702) 784-5252
Email: gbrower@swlaw.com
       pbyrne@swlaw.com
       jcarley@swlaw.com
       cdossier@swlaw.com

Marc E. Kasowitz, Esq.
Andrew K. Glenn, Esq.
Trevor J. Welch, Esq.
KASOWITZ, BENSON, TORRES &
FRIEDMAN LLP
1633 Broadway
New York, NY 10019-6799
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
Email: MKasowitz@kasowitz.com
       AGlenn@kasowitz.com
       TWelch@kasowitz.com
*Pro Hac Vice Pending*

*Attorneys for GCR Gaming, LLC*

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| In re<br><br>GV RANCH STATION, INC.,<br><br>        Debtor.<br>_____<br><br>GCR GAMING, LLC,<br><br>        Movant,<br><br>v.<br><br>GV RANCH STATION, INC.,<br><br>        Respondent. | Case No. 10-50381-gwz<br><br>Chapter 11<br><br>**MOTION (1) TO DISMISS CHAPTER 11 CASE, OR, IN THE ALTERNATIVE, (2) FOR RELIEF FROM THE AUTOMATIC STAY TO EXERCISE APPLICABLE NON-BANKRUPTCY RIGHTS OR (3) TO COMPEL REJECTION OF OPERATING AGREEMENT**<br><br>**Hearing Date:**<br>**Hearing Time:**<br><br>**Hearing Location:**<br>    **United States Bankruptcy Court**<br>    **Clifton Young Federal Building**<br>    **Fifth Floor, Bankruptcy Courtroom No. 1**<br>    **300 Booth Street**<br>    **Reno, Nevada 89509** |

Movant GCR Gaming, LLC ("Movant" or "GCR"), through undersigned counsel, respectfully moves this Court for entry of an order (i) dismissing this Chapter 11 case; or, in the alternative, (ii) compelling the rejection of the joint venture Operating Agreement (as defined below) between Movant and debtor GV Ranch Station, Inc. ("Debtor"); or, in the alternative, (iii) granting relief from the automatic stay for "cause" to permit Movant to enforce its

contractual rights under the Operating Agreement. This Motion is based on the following Memorandum of Points and Authorities, the Declarations of Brian Greenspun and Larry Lindholm, filed concurrently herewith, the exhibits thereto, the pleadings and papers on file herein, and any oral argument the Court entertains.

DATED this 18th day of February, 2010.

SNELL & WILMER L.L.P.

By: _____
Gregory A. Brower (Nevada Bar No. 5232)
Patrick G. Byrne (Nevada Bar No. 7636)
Justin L. Carley (Nevada Bar No. 9994)
Claire Y. Dossier (Nevada Bar No. 10030)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV 89169

Marc E. Kasowitz, Esq.
Andrew K. Glenn, Esq.
Trevor J. Welch, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019-6799
Telephone: (212) 506-1700
Facsimile: (212) 506-1800
*Pro Hac Vice Pending*

*Attorneys for GCR Gaming, LLC*

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# TABLE OF CONTENTS

Page(s)

Table of Authorities ............................................................................................. i

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    JURISDICTION AND VENUE ................................................................ 3

III.   FACTS ....................................................................................................... 3

    A.    The Development Of Green Valley Ranch ..................................... 3

    B.    The Operating Agreement ............................................................. 4

    C.    The Executive Committee .............................................................. 6

    D.    Green Valley Ranch's Former General Manager Blows The
        Whistle On Debtor ......................................................................... 7

    E.    Debtor's Scheme To Siphon Off Customers And Assets Is Revealed .............. 7

        1.    Debtor diverts Green Valley Ranch high-rollers to the 100%
                Owned Casinos ................................................................ 7

        2.    Station Casinos Orders Green Valley Ranch To Stop
                A Highly Successful Direct Mail-Marketing Campaign ............. 10

        3.    Green Valley Ranch Is Forced To Pay Half the Salary of A
                Station Vice President Who Works Exclusively For Red Rock. ............. 11

        4.    Station Saddles Green Valley Ranch With Inferior Food. ....................... 11

    F.    Debtor Files For Chapter 11 In Bad Faith To Evade The Consequences
        Of Its Wrongdoing. ....................................................................... 12

IV.    ARGUMENT ........................................................................................... 13

    A.    Debtor's Chapter 11 Petition Should Be Dismissed As A Bad Faith Filing ....... 13

    B.    In The Alternative, The Court Should Compel Debtor To Reject
        The Operating Agreement Because It Cannot Be Assumed Or Assigned. .......... 16

    C.    The Operating Agreement Also Must Be Rejected Because Of Debtor's
        Incurable And Material Breaches ................................................... 19

        1.    The Operating Agreement Is An Executory Contract ............................. 19

        2.    The Debtor's Breaches Of The Operating Agreement Are Incurable ...... 20

    D.    Alternatively, The Court Should Grant GCR Stay Relief To Redress
        Debtor's Misconduct. .................................................................... 22

V.     CONCLUSION ........................................................................................ 24

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Beckett v. Coatesville Hous. Assocs.*,
    2001 U.S. Dist. LEXIS 9281 (E.D. Pa. July 5, 2001) .......................................................... 23

*C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.)*,
    113 F.3d 1304 (2d Cir. 1997) ................................................................................................ 16

*Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.)*,
    824 F.2d 725 (9th Cir. 1987) ................................................................................................. 22

*HD Supply Facilities Maint., Ltd. v. Bymoen*,
    210 P.3d 183 (Nev. 2009) ..................................................................................................... 17

*In re Allentown Ambassadors, Inc.*,
    361 B.R. 422 (Bankr. E.D. Pa. 2007) ................................................................................... 19

*In re Arnold*,
    806 F.2d 937 (9th Cir. 1986) ........................................................................................... 14, 22

*In re Can-Alta Props., Ltd.*,
    87 B.R. 89 (9th Cir. BAP 1988) ........................................................................................... 22

*In re Catapult Entertainment*,
    165 F.3d 747 (9th Cir. 1999) ("*Catapult*") ......................................................................... 17

*In re Chapin Revenue Cycle Mgmt., LLC*,
    343 B.R. 728 (Bankr. M.D. Fla. 2006) ................................................................................ 21

*In re Daugherty Constr.*,
    188 B.R. 607, 611 (Bankr. D. Neb. 1995). ..................................................................... 17, 19

*In re DeLuca*,
    194 B.R. 65 (Bankr. E.D. Va. 1996) ............................................................................... 17, 19

*In re Eisen*,
    14 F.3d 469 (9th Cir. 1994) .................................................................................................. 14

*In re Little Creek Dev. Co.*,
    779 F.2d 1068 (5th Cir. 1986) ......................................................................................... 13, 23

*In re N.C.P. Mktg. Group*,
    2005 U.S. Dist. LEXIS 30530 (D. Nev. 2005) ..................................................................... 17

*In re N.R. Guaranteed Retirement, Inc.*,
    112 B.R. 263 (Bankr. N.D. Ill), *aff'd* 119 B.R. (N.D. Ill. 1990) ......................................... 13

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

*In re Smith*,
  389 B.R. 902 (Bankr. D. Nev. 2008) ............................................................................. 23

*In re St. Paul Self Storage Ltd.*,
  185 B.R. 580 (B.A.P. 9th Cir. 1995) ............................................................................. 15

*In re Stolrow's, Inc.*,
  84 B.R. 167 (B.A.P. 9th Cir. 1988) ......................................................................... 13, 15

*In re Universal Life Church, Inc.*,
  127 B.R. 453 (E.D. Cal. 1991), *aff'd* 965 F.2d 777 (9th Cir. 1992) ........................... 22

*In re Walter*,
  108 B.R. 244 (Bankr. C.D. Cal. 1989) .......................................................................... 15

*In re West Electronics, Inc.*,
  852 F.2d 79 (3d Cir. 1988) ............................................................................................ 23

*Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.)*,
  304 F.3d 410 (5th Cir. 2002) ......................................................................................... 21

*Marsch v. Marsch (In re Marsch)*,
  36 F.3d 825 (9th Cir. 1994) ..................................................................................... 13, 14

*Milford Power Co., LLC v. PDC Milford Power, LLC*,
  866 A. 2d 738 (Del. Super. 2004) ................................................................................. 19

*Norton v. Hoxie State Bank*,
  61 B.R. 258 (Bankr. D. Kan. 1986) ............................................................................... 22

*United States v. Gould (In re Gould)*,
  401 B.R. 415 (B.A.P. 9th Cir. 2009) ............................................................................. 22

**STATUTES**

11 U.S.C. § 112 ................................................................................................................ 13

11 U.S.C. § 362 ........................................................................................................... 3, 22

11 U.S.C. § 365 ...................................................................................... 2, 3, 16, 17, 19, 21

11 U.S.C. § 1112 ..................................................................................................... 3, 13, 15

28 U.S.C. § 1334 ................................................................................................................ 3

28 U.S.C. §157 ................................................................................................................... 3

28 U.S.C. §§ 1408 and 1409 ............................................................................................. 3

NRS § 86.351 .................................................................................................................. 18

11209178.4
02/18/10

- ii -

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    PRELIMINARY STATEMENT

This motion arises from Debtor's flagrant and continuing breaches of its contractual and fiduciary duties to its joint venture partner, GCR, as manager of the Green Valley Ranch luxury resort and casino in Henderson, Nevada (the "Green Valley Ranch"), and Debtor's improper attempt to forestall the consequences of its wrongdoing through the bad-faith filing of its Chapter 11 petition in this Court.[1]

Movant GCR, a limited liability company formed to invest in Green Valley Ranch, and the Debtor each own a 50% equity interest in Green Valley Ranch Gaming, LLC ("GVR LLC"), which in turn owns Green Valley Ranch.    Under the March 10, 2000 Operating Agreement between and among GCR, Debtor, and GVR LLC (the "Operating Agreement"), Debtor has the exclusive right and obligation to manage Green Valley Ranch.    Debtor itself is a wholly owned subsidiary of non-party Station Casinos, Inc. ("Station").    Station, which along with various affiliates filed voluntary Chapter 11 petitions in July 2009, both owns and operates numerous other casinos in Las Vegas and other parts of Nevada (the "100% Owned Casinos").

In late December 2009, GCR first learned of a long-running scheme implemented by the Debtor to systematically divert customers, business opportunities, and other assets from Green Valley Ranch -- which Debtor derisively calls the "50 cent piece," in reference to its limited 50% ownership -- to the 100% Owned Casinos.    The information concerning the Debtor's scheme is corroborated in detail by, among other things, the sworn statements of Green Valley Ranch's former General Manager, Timothy Wright.    As shown below, the scheme included -- but was not limited to – Debtor's specific, individualized efforts to lure Green Valley Ranch's "high rollers" to Red Rock (a competing, 100% Owned Casino); ordering Green Valley Ranch to terminate a highly successful marketing program; all the way down to instructing the food purveyor to deliver

---

[1] Submitted contemporaneously herewith are the Declaration of Brian Greenspun, sworn to February 18, 2010 (the "Greenspun Decl.") and the Declaration of Larry Lindholm, sworn to February 18, 2010 (the "Lindholm Decl.").    In addition, attached to the Lindholm Decl. as Exhibit B is the Affidavit of Timothy Wright, sworn to February 1, 2010 (the "Wright Aff.").

the "prime" cuts of meat to Red Rock, while sending Green Valley Ranch the "garbage." No detail was too small.

The Debtor's self-serving conduct violates the express terms of the Operating Agreement, which requires Debtor to manage Green Valley Ranch:

> in good faith, in a manner reasonably believed to be *in the best interests* of [Green Valley Ranch] *and* with the same care as a prudent person would exercise in the management *of its own hotel and gaming properties.* [emphasis supplied]

Thus, Debtor was obligated to operate Green Valley Ranch in the best interests of *Green Valley Ranch* -- not in the best interests of Debtor or its corporate parent -- and every bit as well as other Station-operated casinos. Debtor flagrantly violated this provision by treating Green Valley Ranch *far worse* than the 100% Owned Casinos.

Moreover, once the truth came to light, Debtor commenced this bankruptcy case with the express and *admitted* purpose of hindering GCR's ability to redress its breaches of the Operating Agreement. (Greenspun Decl. ¶ 7). Indeed, Debtor commenced this case only after GCR confronted the Debtor with the misconduct it discovered, the Debtor denied the allegations, beseeched GCR not to commence litigation, and promised to provide open access to information that purportedly would prove its innocence. Having lulled GCR temporarily into inaction, Debtor then stonewalled GCR and, instead, filed its Chapter 11 petition in this Court.

There is no *bona fide* reason for the Chapter 11 filing: the Debtor has only three reported unsecured creditors -- *all of which are affiliates of Station* -- which proves that there are no meaningful debts to be restructured. The Court should dismiss this case because it was filed in bad faith to avoid the consequences of its own intentional misconduct. *See* Point I, *infra.*

Even if the Court does not dismiss this case outright, it should nevertheless compel the Debtor to reject the Operating Agreement pursuant to Section 365(c)(1)(A) of Title 11 of the United States Code (the "Bankruptcy Code"). Under the Ninth Circuit's *Catapult* decision, the Operating Agreement -- which sets forth extensive managerial and other responsibilities that are exclusive to Debtor -- is a personal-services contract that may not be assigned under applicable non-bankruptcy law without GCR's consent. *See* Point II, *infra.*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    Rejection of the Operating Agreement also is warranted, pursuant to Section 365(b)(1)(A)

2  of the Bankruptcy Code, based on Debtor's repeated and material breaches of the Operating

3  Agreement.    As shown below, those breaches are not subject to cure, and thus bar Debtor's

4  assumption or assignment of the Operating Agreement.  *See* Point III, *infra*.

5    Finally, and in the alternative, GCR seeks relief from the automatic stay.  The Operating

6  Agreement expressly permits GCR to remove Debtor as the Manager of Green Valley Ranch

7  based on its material and incurable breaches.    As shown below, "cause" exists to modify the

8  automatic stay to permit GCR to enforce these contractual rights.  *See* Point IV, *infra*.

## II.    JURISDICTION AND VENUE

10    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This

11  is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before the Court pursuant to

12  28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested herein are 1112(b),

13  362(d), 365(b), 365(c), and 365(e) of the Bankruptcy Code.

## III.    FACTS

### A.    The Development Of Green Valley Ranch.

16    In 1999, Brian Greenspun and Frank Fertitta III agreed in principle to form a joint venture

17  to build and operate a luxury resort and casino in Henderson, Nevada.  (Greenspun Decl. ¶ 2).

18  Mr. Fertitta is the Chairman and President of Station, which has owned and operated many resorts

19  and casinos in the Las Vegas area and elsewhere for decades.    (*Id.*).  In March 2000, Mr.

20  Greenspun and Mr. Fertitta caused GVR LLC to be formed to construct, hold and operate Green

21  Valley Ranch.  (*Id.* ¶ 3).  Under the terms of the joint venture, and as embodied in the Operating

22  Agreement, each party held a 50% equity interest in the business. (Green Valley Ranch Gaming,

23  LLC Operating Agreement ( the "Operating Agreement") at Ex. E, submitted herewith at

24  Lindholm Decl. Ex. A).  As part of their agreement, the parties agreed to allow Station to operate

25  the casino as a member of the "Station" brand and to manage Green Valley Ranch through an

26  operating subsidiary, Debtor.  (*Id.* §§ 1.1 (definition of "Manager"); 3.1; and 3.4; Lindholm Decl.

27  ¶ 5).

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Station brought to the venture experience and expertise as a casino operator and the well-known "Station" brand name. (*See, e.g.,* Operating Agreement § 3.1; Greenspun Decl. ¶ 2). Station owns and operates numerous other casinos in Las Vegas and other parts of Nevada ("Station brand casino properties"). (Lindholm Decl. ¶ 3). Station brand casino properties include: Red Rock; Palace Station; Boulder Station; Santa Fe Station; Texas Station; Sunset Station; Fiesta Rancho; Wild Wild West; Wildfire Rancho; Gold Rush; Wildfire Boulder; and Lake Mead Casino, which collectively comprise the 100% Owned Casinos. The Station brand casino properties also include: Aliante Station Casino & Hotel; Green Valley Ranch; The Greens Gaming & Dining; Barley's Casino; and Brewery and Wildfire Casino & Lanes, which are 50% co-owned by affiliates of GCR. (*Id.*).

Together as business partners, GCR and Debtor built Green Valley Ranch, which opened to the public in December 2001. (*Id.* ¶ 2). Green Valley Ranch is one of the first luxury resorts off the Las Vegas strip and one of Nevada's premiere destinations for luxury gaming, dining and entertainment. (*Id.*). The Green Valley Ranch property features a 490-room hotel, spa facilities, eight restaurants, a 2,200-seat concert facility, more than 50,000 square feet of event space, and a full-service casino featuring a race and sports book facility, over 2,200 slot and video-poker machines, a 22-table poker room, and over 55 table games including, among others, blackjack, baccarat, craps, and roulette. (*Id.*).

Green Valley Ranch's primary business objective is to provide a superior gaming and recreation experience to high-net-worth individuals, professional gamblers, corporations, and members of the general public seeking a luxury gaming experience. (*Id.*).

**B.    The Operating Agreement.**

On March 10, 2000, GCR entered into the Operating Agreement with Debtor, whereby Debtor was installed as the exclusive manager of Green Valley Ranch. (*Id.* ¶ 5). Broadly speaking, the Operating Agreement defines the respective rights and obligations of GCR and Debtor as Members of Green Valley Ranch, and of Debtor as Manager of Green Valley Ranch. (*Id.; see also, e.g.,* Operating Agreement Articles III, IV, and V).

As evidenced in the Operating Agreement, GCR bargained for and received from Debtor contractual protections of its investment in Green Valley Ranch.    In Section 3.1(a) of the Operating Agreement, titled "Standard of Care," Debtor bound itself to manage the property in accordance with the following standard of care:

> In conducting the management of [Green Valley Ranch], [Debtor] shall (i) comply with the provisions of this Agreement, and (ii) act in good faith in a manner reasonably believed to be in the best interests of [Green Valley Ranch] and with the same care as a prudent person would exercise in the management of its own hotel and gaming properties . . . .

In Section 3.1(b) of the Operating Agreement, titled "Standard of Operation," Debtor bound itself to manage the property in accordance with the following standard of operation:

> [Debtor] shall operate the casino portion of the Project (including restaurants, food and beverage and all other components related thereto) to a standard of operation at least as high as that existing at [Station's] or the [Station's Subsidiaries'] highest quality casinos as of the date of this Agreement, unless the Annual Plan and Operating Budget would not reasonably allow the maintenance of such standard of operation.  [Debtor] shall, at all times during this Agreement, operate the hotel, meeting facilities, room service, restaurants related to the hotel, pool, spa (if [Debtor] operates the spa), concierge, hotel and meeting facilities' valet parking and ancillary food and beverage and other components related to the hotel (excluding the casino related components) to a standard of operation competitive with the service at then-existing higher-end Las Vegas area resorts, unless the Annual Plan and Operating Budget would not reasonably allow the maintenance of such standard of operation.

Further, the Operating Agreement specifically defines Debtor's duty to provide the same level of financial, marketing, and other operational services to Green Valley Ranch as Station provides to its 100% Owned Casinos.  Section 3.4 of the Operating Agreement provides:

> During the Operating Period, [Debtor] shall provide to [Green Valley Ranch] all services customarily provided by [Station], [Debtor] or their respective Subsidiaries or Affiliates to other casinos owned or controlled by [Station], including financial, accounting, marketing, reservations, human resources and risk management services, shall afford [Green Valley Ranch] the benefit of group purchasing and similar services, and shall, subject to the Annual Plan and Operating Budget, take commercially reasonable steps to include [Green Valley Ranch] in such promotions being offered through [Station] (or its Subsidiaries' or Affiliates') other casinos in the Las Vegas area.  In addition, the [Debtor] shall provide [Green Valley Ranch] with the services of senior

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

management personnel of [Station] to the extent required to enable [Green Valley Ranch] to conduct its operations in accordance with Section 3.1(b).

The Operating Agreement provides GCR the right to remove Debtor as Manager of Green Valley Ranch. Section 3.6 of the Operating Agreement describes the grounds for and procedure by which GCR may effect such removal. It provides:

So long as [GCR] is not in material breach of the provisions of this Agreement, [GCR] may give notice to [Debtor] that it desires to remove [Debtor] as the Manager:

****

(iii) upon 30 days prior written notice in the event that [Debtor] engages in an act or omission that is grossly negligent, reckless or constitutes intentional misconduct, and such action or omission has a material adverse effect on [Green Valley Ranch]; provided that such termination shall be effective with respect to any such action or omission that is susceptible to complete cure (i.e., as if there has been no such action or failure to act) only if such action or failure to act has remained uncured at the end of such 30-day period.

The Operating Agreement also provides GCR with the explicit contractual right to bring suit, on Green Valley Ranch's behalf, against Debtor for breach of its obligations thereunder. In particular, Section 3.6(b) provides that even where GCR may not have the right to remove Debtor as Manager:

[GCR] nonetheless may bring an action on its own behalf or on behalf of [Green Valley Ranch], at law, equity or pursuant to other available remedies against [Debtor] as the Manager for breach of its material obligations hereunder (including, but not limited to material breaches of the standards of care and operation) as the Manager and for any damages or other costs incurred by [GCR] or [Green Valley Ranch] as a result of such breach, including, but not limited to, during the design and construction phase of the Project.

C.    **The Executive Committee.**

Under the terms of the Operating Agreement, Movant has limited involvement in the day-to-day operations of the casino, but maintains rights and privileges over certain fundamental decisions of the company through its representation on Green Valley Ranch's Executive Committee. (Lindholm Decl. ¶ 11). On the Executive Committee, Brian Greenspun represents

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

GCR, and Frank J. Fertitta III -- the Chief Executive Officer, Chairman of the Board and Director of Station -- represents Debtor. (Operating Agreement § 3.12; Lindholm Decl. ¶ 11).

Under the Operating Agreement, decisions reserved to and requiring the unanimous approval of the Executive Committee include: decisions to enter into contracts on behalf of Green Valley Ranch for a period greater than one year and subjecting the company to liability in excess of $250,000; decisions regarding the sale of Green Valley Ranch assets worth more than $500,000; decisions to finance any improvements to the property exceeding $1,000,000; and the selection of the General Manager -- the individual responsible for the operation of Green Valley Ranch on a day-to-day basis. (Operating Agreement §§ 1.1 (definition of "General Manager") and 3.13).

In addition, over the course of 2008 and 2009, GCR provided significant capital to allow Green Valley Ranch -- GCR was led to believe -- to weather the economic storms and to ensure that it remained a stable provider of jobs and other economic support to the greater Las Vegas community. (Lindholm Decl. ¶ 13).

**D.      Green Valley Ranch's Former General Manager Blows The Whistle On Debtor.**

In January 2010, Timothy Wright, former General Manager of Green Valley Ranch approached GCR and revealed for the first time, and in great detail, the long-term and far-reaching effort by Debtor and Station systematically to divert Green Valley Ranch's greatest asset -- its loyal customers -- for the benefit of the 100% Owned Casinos, and to sabotage Green Valley Ranch's marketing efforts in order to undercut its ability to compete effectively with the 100% Owned Casinos. (Lindholm Decl. ¶ 15). Mr. Wright's revelations to GCR of Debtor's misconduct, among other things, are summarized below.

**E.      Debtor's Scheme To Siphon Off Customers And Assets Is Revealed.**

**1.      Debtor Diverts Green Valley Ranch High-Rollers To The 100% Owned Casinos.**

Among Green Valley Ranch's most profitable customers are so-called "high rollers," who return to the casino on a regular basis. (Affidavit of Timothy Wright, sworn to February 1, 2010

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1   (the "Wright Aff.") ¶ 6, submitted herewith at Lindholm Decl. Ex. B). Timothy Wright, who has

2   extensive industry experience, attracted high-rollers to Green Valley Ranch during his tenure as

3   General Manager. In particular, Mr. Wright brought customers to Green Valley Ranch that he

4   knew from his prior industry experience. (*Id.*). For example, Mr. Wright invited S.K.,[2] who had

5   never gambled at any casino owned or operated by the Station, to gamble at Green Valley Ranch.

6   (*Id.*). In October 2008 alone, S.K. spent approximately five million dollars gambling at Green

7   Valley Ranch. (*Id.*).

8         Station' COO Kevin Kelley -- who also happens to be the brother-in-law of Frank Fertitta,

9   the CEO and Chairman of Station -- urged Mr. Wright to encourage S.K. and some of the other

10  high-rollers to gamble at Red Rock (a 100% Owned Casino) instead of at Green Valley Ranch.

11  (*Id.* ¶ 9). Mr. Kelley told Mr. Wright it would be "better for the company" for these players to

12  gamble at the 100% Owned Casinos. (*Id.*). Station' Vice President of Operations, Glen Bashore,

13  likewise urged Mr. Wright to encourage S.K. and some of the other high-rollers to gamble at Red

14  Rock. (*See Id.*).

15        In late 2008, another Green Valley Ranch high-roller, D.G., informed Mr. Wright that

16  representatives of Red Rock had been actively soliciting him to gamble at Red Rock, including by

17  offering him prime tickets to an Ultimate Fighting Championship event -- an organization

18  indirectly owned by the Fertitta family, which is likewise the ultimate owner of Station -- at Red

19  Rock. (*Id.* ¶ 10). Mr. Wright called Red Rock's general manager and protested, but Red Rock's

20  solicitation of D.G. and other Green Valley Ranch high-rollers continued unabated. (*Id.*)

21        In July 2009, S.G., a frequent high-roller at Green Valley Ranch, was invited to visit

22  Green Valley Ranch by a casino host. (*Id.* ¶ 15). Not long thereafter, Mr. Kelley called

23  Mr. Wright, and in a profanity-laced conversation, angrily informed Mr. Wright that S.G. was "a

24  known Red Rock player" and reminded Mr. Wright "who [he] work[ed] for," *i.e.*, Station. (*Id.*).

25  Mr. Kelley's tirade and not-so-thinly-disguised threat were patently intended to quash

26

27

28  ───────────────
    [2] Movant refers to non-party gamblers who are mentioned solely to illustrate Debtor's misconduct by their
    initials to protect their identity in this publicly filed document.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    Mr. Wright's growing concerns, or at least the vocal expression of those concerns, over Debtor's

2    apparent infidelity to GCR.

3          As a result of the angry telephone call from Mr. Kelley, Mr. Wright requested a meeting

4    to clarify rules governing "predominance" and establish consistency among Station-operated

5    casinos, including Green Valley Ranch, as to the incentives and rebates used to induce visits by

6    high-roller.  (Id. ¶ 16).  "Predominance" refers to the Station policy that determines how a

7    particular player is identified as a dedicated customer of one casino, such that he or she is "off

8    limits" for marketing efforts by other Station.  (Id.).

9          The meeting took place in August 2009.  (Id. ¶ 17).  Mr. Wright and Green Valley

10   Ranch's gaming executives attended, as did Red Rock's General Manager and its gaming

11   executives.  (Id.).  Mr. Kelley ran the meeting.  (Id.).  At this meeting, Mr. Kelley stated that the

12   predominance policy among Station-operated casinos would be eighteen months, meaning that if

13   a player had been playing at a casino for the last eighteen months, he or she belonged to that

14   property and was off limits to marketing efforts from other Station.  (Id.).

15         Mr. Wright then informed Mr. Kelley that S.G. had been a Green Valley Ranch player for

16   five years, and had only played at Red Rock for the last twelve months due to increased

17   incentives that Red Rock had provided.  (Id.).  Under the predominance policy that Mr. Kelley

18   had just articulated, S.G. should have been a Green Valley Ranch player and off limits to Red

19   Rock.  (Id.).  In response to Mr. Wright's observation, however, Mr. Kelley slammed his fists

20   down on the table top and said "Fine!  Predominance is now twelve months."  He then stated, "I

21   want all of the high-end business at Red Rock where I get 100 cents on the dollar."  (Id.).

22         Approximately one week later, Mr. Wright had another meeting with Mr. Kelley where

23   the predominance policy was again discussed.  (Id. ¶ 18).  Mr. Wright explained to Mr. Kelley

24   that it was very difficult for him to motivate Green Valley Ranch's executive team to work hard

25   to generate revenue at Green Valley Ranch when Mr. Kelley had announced -- in front of these

26   bonus-eligible executives -- that Station wanted all high-end business at Red Rock.  (Id.).  Mr.

27   Kelley did not deny his statements, or take issue with their impact.  (Id.).

28

11209178.4
02/18/10                                    - 9 -

Not all of Station' efforts to divert Green Valley Ranch's high-rollers to Red Rock and other 100% Owned Casinos were so blatant, but many were equally effective. (*Id.* ¶ 19). For example, S.G. had a company credit line of one million dollars. (*Id.).* To ensure that he did not play the full one million dollars at Green Valley Ranch, Mr. Kelley arbitrarily changed S.G.'s credit limit at Green Valley Ranch to five hundred thousand dollars and told S.G. that if he wanted to gamble the other five hundred thousand dollars, he could only do so at Red Rock. (*Id.*). Such a requirement was unprecedented and, of course, made no sense from Green Valley Ranch's perspective. (*Id.*). None of the 100% Owned Casinos had a similar policy. (*Id.*).

### 2.    Station Orders Green Valley Ranch To Stop A Highly Successful Direct Mail-Marketing Campaign.

In early 2009, Green Valley Ranch's Vice President of Marketing and Mr. Wright designed a direct mail-marketing campaign for Green Valley Ranch to increase its revenues. After conducting extensive market research and program design, at or about the end of the first quarter of 2009, Green Valley Ranch sent out its first wave of direct mailings. (*Id.* ¶ 21). Station was able to track the success of the program when customers identified and presented the mailings upon booking rooms and packages. (*Id.*). Approximately 90 days after the mailings commenced, occupancy rates, revenues and other indicators of Green Valley Ranch's performance improved dramatically. (*Id.*).

In July 2009, Mr. Wright attended a meeting along with Mr. Kelley, Mr. Bashore, Marc Oppenheimer and certain other Green Valley Ranch employees. (*Id.* ¶ 22). Although Green Valley Ranch's direct mail-marketing campaign was a huge and ongoing success, Mr. Kelley directed Station' marketing department to terminate Green Valley Ranch's campaign immediately. (*Id.*). Despite Mr. Wright's strongly voiced objections, Mr. Kelley once again told him that this decision was "good for the company" -- meaning it was good for Station, not that it was good for Green Valley Ranch. (*Id.*).

Station subsequently launched its own direct-mail campaign, which covered the 100% Owned Casinos, but excluded Green Valley Ranch for the first 30 days of the campaign. Station'

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    campaign also gave incentives for players -- including players at Green Valley Ranch -- to visit

2    100% Owned Casinos, without any reciprocal benefits to Green Valley Ranch.  (*Id.* ¶ 24).

3         Not surprisingly, after the cancellation of Green Valley Ranch's direct mail-marketing

4    program, Green Valley Ranch's room nights -- a simple measure of how many nights, in total,

5    had been booked at Green Valley Ranch -- and gross revenues declined precipitously.  (*Id.* ¶ 23).

6    **3.    Green Valley Ranch Is Forced To Pay Half The Salary Of A Station Vice**

7    **President Who Works Exclusively For Red Rock.**

8         In or about March 2009, Station hired Raymond Demman as Corporate Vice President of

9    Player Development for its "Luxury Brand," which includes Red Rock and Green Valley Ranch.

10   (*Id.* ¶ 11).  Mr. Demman, who had previously worked for Mr. Kelley, was charged with assisting

11   both Green Valley Ranch and Red Rock in their marketing efforts for high-rollers.  (*Id.*).  Under

12   this arrangement, Green Valley Ranch was responsible for paying half of Mr. Demman's salary.

13   (*Id.*).

14        Mr. Demman never even visited Green Valley Ranch.  (*Id.* ¶ 12).  Mr. Demman never

15   returned any of Mr. Wright's calls and responded to very few e-mail requests for assistance at

16   Green Valley Ranch.  (*Id.*).  Remarkably, this supposed employee of Green Valley Ranch never

17   performed any service that benefited Green Valley Ranch.  (*Id.*).

18        When Mr. Wright complained that Green Valley Ranch was bearing half the cost of

19   Mr. Demman's salary, but was receiving no benefits from his services, Mr. Kelley informed Mr.

20   Wright that Mr. Demman was working exclusively for Red Rock.  (*Id.* ¶ 13).  Mr. Wright sent

21   Mr. Demman an e-mail asking him to stop allowing Red Rock to use Green Valley Ranch's

22   player database for the benefit of Red Rock, but use of the database continued unabated.  (*Id.*).

23   **4.    Station Saddles Green Valley Ranch With Inferior Food.**

24        Mr. Wright became aware that the food at Hank's Steakhouse -- Green Valley Ranch's

25   flagship restaurant -- did not meet the standard expected at a luxury casino.  (*Id.* ¶ 25).  Upon

26   investigation, it was revealed that this treatment was intentional, and resulted from a directive

27   issued by Station to saddle Green Valley Ranch with inferior food products.  (*Id.*).  Indeed, Mr.

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    Wright learned that Station had ordered its shared food purveyor to deliver all premium cuts of

2    meat to Red Rock, and to provide Hank's Steakhouse with only the lesser quality cuts. (*Id.*).

3    **F.    Debtor Files For Chapter 11 In Bad Faith To Evade The Consequences Of Its**
         **Wrongdoing.**

4

5    On July 28, 2009, Station and 17 of its affiliates filed voluntary petitions for relief

6    under chapter 11 of the Bankruptcy Code (the "Main Station Debtors"). (Main Station Case

7    Docket No. 1). The cases are currently being jointly administered pursuant to a joint

8    administration order dated July 30, 2009 (Main Station Case Docket No. 7) under main case

9    number 09-52477 in the United States Bankruptcy Court for the District of Nevada (the "Main

10   Station Case").

11   On February 10, 2010, Debtor filed a voluntary petition for relief under Chapter 11 of

12   the Bankruptcy Code in this Court until (the "Chapter 11 Case"). (Debtor Docket No. 1).

13   Unlike the Main Station Debtors, who have thousands of creditors holding billions of dollars in

14   claims, Debtor's Chapter 11 petition lists only three creditors -- all of which are Station

15   affiliates -- with unspecified amounts. (Debtor Docket No. 3). Debtor claimed assets of $100

16   million to $500 million -- roughly *ten times greater* than its claimed liabilities of only $10 million

17   to $50 million. (Debtor Docket No. 1).

18   The timing of its filing suggests that Debtor's Chapter 11 petition was filed with the intent

19   of hindering GCR's enforcement of its rights under the Operating Agreement. The admissions of

20   a Station executive confirm this is the case. (Greenspun Decl. ¶ 7).

21   On Monday, February 1, 2010, former Green Valley Ranch General Manager Timothy

22   Wright executed an affidavit attesting to Debtor's long-running scheme, detailed above, to divert

23   customers and business opportunities from Green Valley Ranch to the 100% Owned Casinos.

24   (*See* Wright Aff.).

25   Based on GCR's long business partnership with Debtor, Brian Greenspun felt obligated to

26   bring Debtor's misconduct to Frank Fertitta's attention and give him an opportunity to explain

27   before taking any legal action or causing GCR to exercise its contractual right to remove Debtor

28   as the manager of Green Valley Ranch. (Greenspun Decl. ¶ 5). On February 4, 2010, Mr.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    Greenspun met with Mr. Fertitta for this reason. (*Id.*). Mr. Fertitta denied that Debtor had

2    engaged in any misconduct, implored Mr. Greenspun not to initiate any legal action and promised

3    to provide full transparency and disclose whatever facts were necessary to convince Mr.

4    Greenspun that Debtor had not engaged in any misconduct. (*Id.*). However, over the course of

5    the following week, Mr. Fertitta and his representatives at Station refused to supply such

6    information, notwithstanding Mr. Greenspun's repeated requests. (*Id.*).

7        On the afternoon of February 10, 2010, Debtor filed a voluntary petition for bankruptcy.

8    (Debtor Docket No. 1). That evening, Mr. Greenspun met with Mr. Fertitta to insist that he

9    follow through on his promise of complete transparency into the operation of Green Valley

10   Ranch. (Greenspun Decl. ¶ 6). Mr. Fertitta told Mr. Greenspun that he did not object to

11   transparency but did not want to get lawyers involved. (*Id.*). At that meeting, Mr. Fertitta and

12   Mr. Greenspun agreed in principle to a standstill agreement that would preserve everyone's rights

13   while GCR moved forward with its investigation. (*Id.*). Amazingly, Mr. Fertitta never said a

14   word about Debtor's bankruptcy filing earlier in the day, which already had affected GCR's

15   rights. (*Id.*).

16       On February 11, upon learning that Debtor had filed for bankruptcy the previous day, Mr.

17   Greenspun called Station executive Scott Neilson to ask him why no one had told him that Debtor

18   intended to, and in fact had, filed for bankruptcy. (*Id.* ¶ 7). Mr. Neilson admitted to Mr.

19   Greenspun that Mr. Fertitta had directed Debtor to file for bankruptcy to "protect himself"

20   because GCR had been "threatening to sue" Debtor. (*Id.*).

21                    **III.    ARGUMENT**

22   **A.    Debtor's Chapter 11 Petition Should Be Dismissed As A Bad Faith Filing.**

23       Section 1112(b) of the Bankruptcy Code authorizes this Court to dismiss a Chapter 11

24   filing "for cause." 11 U.S.C. § 112(b). Courts "have overwhelmingly held that a lack of good

25   faith in filing a Chapter 11 petition establishes cause for dismissal." *Marsch v. Marsch (In re*

26   *Marsch)*, 36 F.3d 825, 828 (9th Cir. 1994) (*citing In re Little Creek Dev. Co.,* 779 F.2d 1068,

27   1072 (5th Cir. 1986)); *In re Stolrow's, Inc.,* 84 B.R. 167, 170 (B.A.P. 9th Cir. 1988); *In re N.R.*

28

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1  *Guaranteed Retirement, Inc.,* 112 B.R. 263, 270 (Bankr. N.D. Ill), *aff'd* 119 B.R., 149 (N.D. Ill.

2  1990).

3      Bad faith exists where, as here, "a debtor is attempting to unreasonably deter and harass

4  creditors." *In re Marsch,* 36 F.3d. at 828, *citing In re Arnold,* 806 F.2d 937, 939 (9th Cir. 1986).

5  Accordingly, bad faith is evident when a filing is made for "tactical reasons unrelated to

6  reorganization." *Id.* Applying this logic, the Ninth Circuit has affirmed the dismissal of Chapter

7  11 petitions, based on the petitioner's bad faith, when it is apparent that the petition in question

8  was filed to thwart state court action. *See In re Eisen*, 14 F.3d 469, 470 (9th Cir. 1994) ("Bad

9  faith exists where the debtor only intended to defeat state court litigation.").

10     In this case, Debtor's petition was filed in bad faith because its express purpose -- as

11 Debtor itself *admitted* -- was to forestall GCR's taking action to remove it as manager of Green

12 Valley Ranch and commence related state-court litigation. (Greenspun Decl. ¶ 7)  When GCR's

13 Brian Greenspun met Frank Fertitta on February 4, 2010 -- to confront him with the allegations of

14 misconduct in the Wright Affidavit -- Greenspun made clear that GCR was prepared to remove

15 Debtor as Manager of Green Valley Ranch and commence litigation for breach of the Operating

16 Agreement. (*See* Greenspun Decl. ¶ 5).  GCR communicated with Debtor several times to

17 request specific due diligence items directly relevant to the misconduct alleged by Mr. Wright.

18 (*Id.*).  But rather than responding to the inquires it had invited, let alone substantiating its

19 prote*Station* of innocence as Fertitta had promised, Debtor filed its Chapter 11 petition -- thereby

20 rendering GCR legally incapable of exercising its contractual right to remove Debtor as Manager

21 of Green Valley Ranch or proceeding with its state court action.

22     The same day Debtor filed for bankrupcty, but prior to Mr. Greenspun learning of the

23 filing, Mr. Fertitta met with Mr. Greenspun and told Mr. Greenspun that he did not object to

24 transparency but did not want to get the lawyers involved. (*Id.* ¶ 6). At this meeting, Mr. Fertitta

25 and Mr. Greenspun agreed in principle to a standstill agreement that would preserve both GCR

26 and Debtor's rights while GCR moved forward with its investigation. (*Id.* ¶ 6).  Amazingly,

27 Mr. Fertitta never said a word about Debtor's bankruptcy filing earlier in the day, which already

28 had affected GCR's rights. (*Id.*).  On February 11, when Mr. Greenspun learned that Debtor had

filed for bankruptcy the previous day, he called Station executive Scott Neilson to ask him why no one had told him that Debtor intended to, and in fact had, filed for bankruptcy. (*Id.* ¶ 7). Mr. Neilson admitted that Mr. Fertitta had directed Debtor to file for bankruptcy to "***protect himself***" because GCR had been "***threatening to sue***" Debtor. (*Id.*)

All of these facts -- the misconduct identified by Mr. Wright, the timing of the Chapter 11 petition, Debtor's blatant misrepresentations to Mr. Greenspun regarding its intentions, and the explicit admission of a Station executive -- demonstrate that Debtor's petition was made for the purpose of delaying, harassing, and deterring GCR from enforcing its legal and contractual rights. This is a textbook example of a bad-faith filing, and this Court should dismiss the petition for cause under Section 1112(b) of the Bankruptcy Code.

Other factors that courts have considered as indicia of a bad-faith petition likewise support dismissal here. These factors often include, but are not limited to, the following:

(1) the debtor has only one asset.

(2) there are generally no employees except for the principals.

(3) there is little or no cash flow, and no available sources of income to sustain a plan of reorganization or to make adequate protection payments.

(4) there are few, if any, unsecured creditors whose claims are relatively small.

(5) there are allegations of wrongdoing on the part of the debtor or its principals.

(6) bankruptcy offers the only possibility of forestalling loss of the property.

*See In re St. Paul Self Storage Ltd.*, 185 B.R. 580, 582-583 (B.A.P. 9th Cir. 1995) (listing factors typically present in bad faith filings and affirming the bankruptcy appellate panel's decision to uphold the bankruptcy court's order dismissing the debtor's case for bad faith); *In re Walter,* 108 B.R. 244, 247 (Bankr. C.D. Cal. 1989) (listing bad faith factors and dismissing debtor's case for for bad faith cause); *In re Stolrow's, Inc.*, 84 B.R. at 171 (listing factors to be considered in a motion to dismiss for cause).

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

These factors likewise support the conclusion that Debtor's Chapter 11 petition was made in bad faith. *First*, the Debtor's only asset is its interest in Green Valley Ranch. *Second*, Debtor has no employees apart from its corporate principals. *Third*, the only meaningful cash flows to which it may be entitled are management fees for its performance as Manager of Green Valley Ranch, and those fees -- given the present downturn in the Las Vegas economy -- are not being paid, rendering the likelihood of sustaining a plan of reorganization remote. Moreover, Debtor's lack of cash flow -- like its purported actual or impending insolvency -- is a direct result of its own intentional, and ultimately *self-destructive*, actions to divert customers, business opportunities, and other assets away from Green Valley Ranch to the 100% owned casinos. *Fourth*, GCR is the *only* unsecured creditor of Debtor that is not a Station-controlled affiliate. Thus, this is a two-party dispute between Debtor and GCR, which also mandates dismissal of the case. *See C-TC 9th Ave. Pshp. v. Norton Co. (In re C-TC 9th Ave. Pshp.)*, 113 F.3d 1304, 1311-1312 (2d Cir. 1997) (conclusion that Debtor's financial problems were a two-party dispute that could be resolved in a pending state-court action supported a finding that the Chapter 11 petition was made in bad faith).

The presence of these factors provides ample additional evidence that Debtor's Chapter 11 filing was made in bad faith. The Debtor is using Chapter 11 to gain an advantage in a two-party dispute with GCR, not for any valid reorganization purpose. If Debtor truly needed to reorganize with the Main *Station* Debtors, it would have filed its Chapter 11 petition in July 2009 -- not in February 2010, just days after being confronted with allegations of its own misconduct. Accordingly, cause exists for dismissal of the petition.

**B.      In The Alternative, The Court Should Compel Debtor To Reject The Operating Agreement Because It Cannot Be Assumed Or Assigned.**

Even if this Court does not dismiss the petition outright, it should nevertheless compel Debtor to reject the Operating Agreement because it is an executory contract for personal services that, under applicable Nevada law, cannot be assumed or assigned without GCR's consent (which GCR does not provide). As a matter of law, such personal services contracts cannot be assumed or assigned under Section 365 of the Bankruptcy Code.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Section 365 provides that:

> (c)    The trustee may not assume or assign any executory contract or unexpired    lease of the debtor, whether or not such contract or lease prohibits or    restricts assignment of rights or delegation of duties, if --
>
>> (1)(A) applicable law excuses a party, other than the debtor, to such    contract or   lease from accepting performance from or rendering    performance to an entity other than the debtor or the debtor in    possession, whether or not such contract or lease prohibits or    restricts assignment of rights or delegation of duties; and
>>
>> (2)    such party does not consent to such assumption or assignment;

11 U.S.C. § 365 (c).

In *In re Catapult Entertainment*, 165 F.3d 747, 749-50 (9th Cir. 1999) ("*Catapult*"), the Ninth Circuit, interpreting Section 365(c)(1), held that "a debtor in possession may not assume an executory contract over the non-debtor's objection if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party." *Catapult*, 165 F.3d at 750; *In re N.C.P. Mktg. Group*, 2005 U.S. Dist. LEXIS 30530, *8-9 (D. Nev. 2005) (same). Thus, under *Catapult,* if applicable Nevada law would bar the Debtor's assignment of its rights and duties under the Operating Agreement to a hypothetical third party, Debtor is precluded from assuming the Operating Agreement and it must be rejected.

Well-settled Nevada law, which governs here, holds that personal service contracts cannot be assigned without consent of the counterparty. *HD Supply Facilities Maint., Ltd. v. Bymoen*, 210 P.3d 183, 186 (Nev. 2009) ("[W]e conclude that [Court's] rule of nonassignability stands for the general proposition, grounded in the law of contractual assignments, that personal services contracts are not assignable absent consent.") (citations omitted).  And other bankruptcy courts have held explicitly that LLC operating agreements -- like the Operating Agreement -- constitute personal services contracts. In *In re DeLuca,* 194 B.R. 65, 77 (Bankr. E.D. Va. 1996) (the duty to make cash contributions and to manage the project render an LLC operating agreement a personal services contract; the manager of the LLC "[wa]s material to [the] very existence of the company"); *see also In re Daugherty Constr.,* 188 B.R. 607, 611 (Bankr. D. Neb. 1995) ("Like a

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

partnership, members of the LLC have voluntarily associated in a business enterprise and the relationship among members may be personal in character.").

The Operating Agreement is a contract for personal services. As stated more fully above, the Operating Agreement requires Debtor to exercise authority as a member of the Executive Committee, and exclusively to manage Green Valley Ranch. (*See* Operating Agreement §§ 3.1, 3.4, 3.12, 4.1, 4.2) Indeed, it was specifically because of Station's specialized knowledge, skill, and previous experience in operating a casino resort property that GCR entered into a joint venture LLC with Station. (Greenspun Decl. ¶ 2). And the explicit terms of the Operating Agreement confirm that "[t]he rights, duties and obligations of Station as Manager *are personal to Station based on Station and Parent's unique experience. . . .*" (Operating Agreement § 3.1) (emphasis added).

Nevada law explicitly prohibits LLC members from assigning their rights and responsibilities under an LLC operating agreement, absent consent of the majority of members. NRS § 86.351 states:

> [u]nless otherwise provided in the articles or operating agreement, a transferee of a member's interest has no right to participate in the management of the business and affairs of the company *or to become a member* unless a majority in interest of the other members approve the transfer.

NRS § 86.351 (emphasis added). The Operating Agreement also unambiguously singles out Station GVR's position as Manager and states that "[t]he rights, duties and obligations of Station as Manager . . . *may not be transferred, assigned or delegated without the prior approval of GCR and Station.*" (*Id.* § 3.1). The Operating Agreement further provides that membership interests cannot be transferred, assigned, or delegated (subject to certain exceptions for affiliate transactions) without both Debtor and GCR's consent. (*Id.* § 5.2).

Thus, under Nevada law and the express terms of the parties' agreement, Debtor cannot assign its rights and duties under the Operating Agreement unless GCR approves the assignment. Because GCR does not and will not consent to any such assumption or assignment, this Court

Snell & Wilmer
L.L.P.—
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1    should enter an order compelling Debtor to reject the Operating Agreement immediately in

2    accordance with Section 365(d)(2) of the Bankruptcy Code.

3    **C.    <u>The Operating Agreement Also Must Be Rejected Because Of Debtor's Incurable</u>**
     **<u>And Material Breaches</u>.**

4

5    Debtor's repeated and material breaches of the Operating Agreement, which are not

6    subject to cure, preclude assumption of the Debtor's role as Manager and constitute an

7    independent basis to compel rejection of the Operating Agreement.

8    Section 365(b)(1)(A) of the Bankruptcy Code bars a trustee from assuming or assigning

9    an executory contract under which there has been a default unless the trustee: (i) cures the default

10   or provides adequate assurance that the default will be promptly cured; (ii) compensates or

11   provides adequate assurance that the trustee will promptly compensate the other party for any

12   pecuniary loss to the party resulting from the default, *and* (iii) provides adequate assurance of

13   future performance under the contract or lease. *See* 11 U.S.C. § 365(b)(1)(A). The Debtor cannot

14   satisfy these requirements.

15   **1.    The Operating Agreement Is An Executory Contract.**

16   The Operating Agreement, which provides for extensive ongoing managerial and other

17   responsibilities by the Debtor, is an executory contract. Courts generally have found that

18   operating agreements for an LLC constitute executory contracts where, as here, they impose

19   continuing duties and responsibilities on their members, such as duties to manage the LLC,

20   obligations to provide capital contributions, and duties to provide personal expertise. *See, e.g., In*

21   *re Allentown Ambassadors, Inc.*, 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007) (concluding that LLC

22   operating agreement was an executory contract because members of the LLC "had ongoing,

23   material, unperformed obligations to one another" including "the duty to manage the LLC and []

24   the duty to make additional cash contributions if needed by the LLC"); *see also In re DeLuca*,

25   194 B.R. at 77 (finding that the LLC agreement constituted "an executory contract, since the

26   object of the agreement [had] not yet been accomplished and the parties [had] on-going duties and

27   responsibilities to bring the project to a successful conclusion"); *In re Daugherty Construction*,

28   188 B.R. at 612; *Milford Power Co., LLC v. PDC Milford Power, LLC*, 866 A. 2d 738, 750 (Del.

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

Ch. 2004) ("the substantial weight of federal authority [] treats agreements for the operation of entities like limited partnerships and LLCs as executory contracts when those agreements contemplate an important, on-going role for the debtor in management").

The express terms of the Operating Agreement demonstrate its executory nature. As shown above, Section 3.1 states that "the Manager shall have the complete right and authority to manage the business and affairs of [Green Valley Ranch]," and provides the standards of care under which the Manager must conduct the management and operation of Green Valley Ranch. (Operating Agreement §§ 3.1, 3.3). The Operating Agreement also requires the manager to undertake certain duties during both the pre-opening stage of the project, such as "supervising the designing, equipping, decorating and furnishing of the Project" (*id.* § 3.3), and the operational period, such as providing "financial, accounting, marketing, reservations, human recourses, and risk management services." (*Id.* § 3.4).

The Operating Agreement provides for the compensation of the Manager (*id.* § 3.5), limitations on liability for the Manager (*id.* § 3.10), and the process of and grounds for removal of the Manager. (*Id.* § 3.6). In addition, Debtor was contractually required to make an initial capital contribution to Green Valley Ranch. (*Id.* § 4.1(b)). The Operating Agreement also provides for additional capital contributions, which Debtor can only decline on pain of dilution. (*Id.* § 4.2). All of these provisions relate to Debtor's ongoing responsibilities, and all of them confirm that the Operating Agreement is an executory contract.

**2.    The Debtor's Breaches Of The Operating Agreement Are Incurable.**

Debtor's defaults under the Operating Agreement are not subject to cure. Indeed, the Debtor's misconduct constitutes material breaches of the standards of care and operation in the Operating Agreement, and has caused irreparable harm to the goodwill, customer relations, and reputation of Green Valley Ranch. As set forth above and in the accompanying affidavit and declarations, Debtor's defaults and material breaches of the Operating Agreement include, but are not limited to: (i) diverting customers and business opportunities away from Green Valley Ranch to the 100% Owned Casinos; (ii) refusing to enforce Station's own "predominance" policy with

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

respect to Green Valley Ranch clients; (iii) setting discriminatory betting limits at Green Valley Ranch; (iv) granting access to Green Valley Ranch's customer lists to the 100% Owned Casinos; (v) allowing the 100% Owned Casinos to market directly to Green Valley Ranch's customers; (vi) terminating Green Valley Ranch's direct mail campaign; (vii) appropriating Green Valley Ranch-owned market data and marketing strategy for the benefit of the 100% Owned Casinos; (viii) forcing Green Valley Ranch to pay one-half of the salary of a supposed employee who worked exclusively for one of the 100% Owned Casinos; and (ix) purposefully directing vendors to supply inferior-grade meat and other food products to Green Valley Ranch. (*See* Wright Aff ¶¶ 8-25).  By committing these acts and engaging in these activities, Debtor has breached its obligations under Sections 3.1(a), 3.1(b) and 3.4 of the Operating Agreement, including, in particular, the obligations to "act in *good faith* in a manner reasonably believed to be in the *best interests* of [Green Valley Ranch] *and* with the *same care* as a prudent person would exercise in the management of its *own hotel and gaming properties*." (*See Id.* § 3.1(a) (emphasis supplied)).

Debtor's breaches are not subject to cure.  There is no way to make up for the lost business, lost customers, and lost potential customers that Debtor successfully diverted.  Nor could debtor cure the harm it caused to Green Valley Ranch's reputation by restricting its clients' credit limits, or providing the inferior food to its flagship restaurant.  Neither money damages, nor future compliance with Debtor's obligations, would remedy or redress the harm it has caused.

Because Debtor's defaults are incurable, by either monetary or nonmonetary means, the Operating Agreement cannot be assumed under Section 365(b) of the Bankruptcy Code, and cause exists to lift the stay.  *See Lifemark Hospitals, Inc. v. Liljeberg Enters. (In re Liljeberg Enters.),* 304 F.3d 410 (5th Cir. 2002) (overturning district court's decision allowing plaintiff to assume the contract and holding that defendant committed incurable defaults under the agreement which, pursuant to 11 U.S.C. § 365(b)(1), should have precluded an order granting plaintiff's motion to assume); *In re Chapin Revenue Cycle Mgmt., LLC,* 343 B.R. 728, 731 (Bankr. M.D. Fla. 2006) (where the default is non-monetary and is incurable, the debtor is precluded from assuming an executory contract if the default was material or if the default caused "substantial economic detriment").

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

**D.**    **Alternatively, The Court Should Grant GCR Stay Relief To Redress Debtor's Misconduct.**

Even if this Court declines to dismiss the Chapter 11 petition or compel rejection of the Operating Agreement, it should nevertheless grant relief from the automatic stay to permit GCR to enforce its contractual right to remove Debtor as manager of Green Valley Ranch.

Section 362(d)(1) of the Bankruptcy Code sets forth the grounds for relief from the automatic stay. It provides, in pertinent part:

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –
>
> (1)    for cause, including the lack of adequate protection of an interest in property of such party in interest;

GCR, as the party seeking relief from stay, must first establish a prima facie case that cause exists for relief under Section 362(d)(1) of the Bankruptcy Code. *See United States v. Gould (In re Gould)*, 401 B.R. 415, 426 (B.A.P. 9th Cir. 2009) (citing *Duvar Apt., Inc. v. FDIC (In re Duvar Apt., Inc.)*, 205 B.R. 196, 200 (B.A.P. 9th Cir. 1996)). Once a prima facie case has been established, the burden shifts to the debtor to show that relief from the stay is not warranted. *See id.* Stay relief must be obtained even for non-assumable, non-assignable executory contracts. *See Computer Communications, Inc. v. Codex Corp. (In re Computer Communications, Inc.)*, 824 F.2d 725, 730 (9th Cir. 1987).

"Cause" pursuant to section 363(d)(1) has no clear definition and is determined on a case-by-case basis. *See In re Universal Life Church, Inc.,* 127 B.R. 453, 455 (E.D. Cal. 1991), *aff'd* 965 F.2d 777 (9th Cir. 1992); *Norton v. Hoxie State Bank,* 61 B.R. 258 (Bankr. D. Kan. 1986) ("'Cause' ….is broad and extends beyond the concept of adequate protection."). In this case, "cause" for relief from the stay exists for independent reasons.

*First*, a bad faith bankruptcy filing constitutes "cause" for lifting the stay. *In re Can-Alta Props., Ltd.,* 87 B.R. 89, 91 (9th Cir. BAP 1988); *see also In re Arnold*, 806 F.2d at 939 ("The debtor's lack of good faith in filing a bankruptcy petition has often been used as cause for removing the automatic stay.") (*citing In re Kemble*, 776 F.2d 802, 807 (9th Cir. 1985) (debtor's

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

1  dilatory behavior a proper consideration in lifting stay)); *In re Littlecreek Dev. Co.*, 779 F.2d

2  1068, 1071 (5th Cir. 1986) (lack of good faith constitutes "cause" for lifting stay). Further,

3  "many courts have held that the same standard applies to terminating the stay for a lack of good

4  faith" as is applied for determining whether to dismiss a Chapter 11 petition for bad faith. *See In*

5  *re Smith*, 389 B.R. 902, 924 (Bankr. D. Nev. 2008). Accordingly, based on the same acts

6  evidencing bad faith described in Point I, *supra,* cause exists to lift the stay based on Debtor's bad

7  faith.

8      *Second*, cause exists to lift the stay based on the Debtor's material breaches of the

9  Operating Agreement and because it may not be assumed as a matter of law. *See In re West*

10  *Electronics, Inc.*, 852 F.2d 79 (3d Cir. 1988) (holding that "cause" to terminate the automatic stay

11  includes allowing a party to terminate a non-assumable, non-assignable executory contract).

12  These extensive, deliberate, and material breaches of the Operating Agreement have irreparably

13  harmed Green Valley Ranch and are not subject to cure. As noted above, *see* Point III, *supra*,

14  applicable bankruptcy law makes clear that Debtor cannot assume its obligations under the

15  Operating Agreement, and the contract therefore must be rejected. But the Operating Agreement

16  itself *also* provides GCR with the right to terminate Debtor as managing Member in the event of

17  material breach. Under Section 3.6, GCR may do so if Debtor:

18      engages in an act or omission that is grossly negligent, reckless or
        constitutes intentional misconduct, and such action or omission has
19      a material adverse effect on [Green Valley Ranch]; provided that
        such termination shall be effective with respect to any such action
20      or omission that is susceptible to complete cure (i.e., as if there has
        been no such action or failure to act) only if such action or failure to
21      act has remained uncured at the end of such 30-day period.

22  (Operating Agreement § 3.6(iii)) To the extent that this Court may decline to compel rejection,

23  GCR respectfully requests that the Court enter an order modifying the automatic stay to permit

24  GCR to remove Debtor as Manager pursuant to the LLC Operating Agreement. *See Beckett v.*

25  *Coatesville Hous. Assocs.*, 2001 U.S. Dist. LEXIS 9281 (E.D. Pa. July 5, 2001) (lifting the

26  automatic stay to permit creditor to enforce order of possession relating to executory contract that

27  debtor had incurably breached).

28

1

## IV.    CONCLUSION

For the foregoing reasons, GCR respectfully requests that this Court enter an order (i) dismissing the Chapter 11 Case; (ii) compelling rejection of the Operating Agreement; or (iii) granting relief from the automatic stay for "cause" to permit GCR to enforce its rights to remove Debtor as Manager of Green Valley Ranch Gaming, LLC pursuant to the Operating Agreement.

DATED this 18th day of February, 2010.

SNELL & WILMER L.L.P.

By: _____
Gregory A. Brower (Nevada Bar No. 5232)
Patrick G. Byrne (Nevada Bar No. 7636)
Justin L. Carley (Nevada Bar No. 9994)
Claire Y. Dossier (Nevada Bar No. 10030)
3883 Howard Hughes Parkway, Suite 1100
Las Vegas, NV  89169

Marc E. Kasowitz, Esq.
Andrew K. Glenn, Esq.
Trevor J. Welch, Esq.
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019-6799
Telephone: (212) 506-1700
Facsimile:  (212) 506-1800
*Pro Hac Vice Pending*

*Attorneys for GCR Gaming, LLC*

Snell & Wilmer
L.L.P.
LAW OFFICES
3883 HOWARD HUGHES PARKWAY, SUITE 1100
LAS VEGAS, NEVADA 89169
(702)784-5200

11209178.4
02/18/10

- 24 -